POTEAU STATE BANK, a corporation, Appellee,

v.

Nena Haskins DENWALT et al., Appellants.

No. 50421.

Supreme Court of Oklahoma.

July 3, 1979.

As Corrected July 9, 1979.

---

Douglas W. Sanders, Sullivan & Sanders, Ted A. Knight, Poteau, for appellee.

Eagleton, Nicholson & Pate, Oklahoma City, for appellant.

George H. McBee, Hamilton & McBee, Poteau, for First National Bank of Fort Smith, Arkansas.

Lunn & Mayes, Muskogee, amicus curiae.

OPALA, Justice:

The dispositive issue here is whether a prior secured party's act, as a corporate officer of the debtor, in executing, by bill of sale, a transfer of the collateral to a third party, with a covenant that it is free of all encumbrances, did impliedly operate as her individual authorization for the sale thereof. If so, then the security interest she had in that collateral as an individual did not survive the sale under 12A O.S.1971 § 9–

306(2). We resolve the issue by an affirmative answer and hold the interest in question was released with the transfer as a matter of law.

Under review here is the trial court's replevin-action judgment allowing Poteau State Bank [Bank][1] a perfected security interest in certain equipment in which Nena Haskins Denwalt's [Denwalt][2] claim to like interest came to be rejected. The judgment also allowed the First National Bank of Fort Smith, Arkansas [Ft. Smith Bank] a lien which was declared to be inferior only to that of the Bank. The Ft. Smith Bank claimed a security interest in some of the equipment which stood as security for the Bank's loan.

Denwalt claimed a security interest [prior to that of the Bank] as a holder of two promissory notes and of a like number of perfected security interests in the same equipment.[3] When Denwalt acquired her security interest she was also a majority stockholder and Secretary-Treasurer of the Ben Haskins Co. [Haskins], then owner of the equipment. Some time later, acting in her corporate capacity, Denwalt conveyed the equipment, by bill of sale, to Construction Equipment Leasing Co. [Construction]. She covenanted it to be free of all encumbrances. Unaware of Denwalt's prior perfected security interest, the Bank accepted from Construction a promissory note and a security interest in the same equipment.

Somewhat later [July 1975] Denwalt entered into a stock purchase agreement with Roger L. Hewitt [Hewitt], a majority stockholder in Construction, by which she sold to him all her stock in Haskins and agreed to cancel certain indebtedness Haskins owed her.[4] The Denwalt/Hewitt agreement pro-

---

1. Plaintiff/appellee.

2. Defendant/appellant.

3. The first note and security agreement [1972], executed by the Ben Haskins Co. to the Estate of Ben Haskins [Nena Haskins Denwalt, executrix], was subsequently assigned to Denwalt. The second note [1973] was executed by the Ben Haskins Co. directly to Denwalt. Denwalt's security interest was claimed to be in, among other things, four pieces of equipment in suit: (a) Wabco tractor and roller (b) Mack truck (c) Koehring crane and (d) Bantom backhoe.

4. Denwalt was to receive $188,000 under the terms of the stock purchase agreement for the sale of her 135,000 shares in Haskins and $100,000 for cancelling the indebtedness owed to her by Haskins.

vided that if any of the equipment conveyed by Haskins to Construction were sold before the promissory note to Denwalt for stock had been fully paid off, the proceeds of the equipment sale would be applied on the note payment to Denwalt.

Trial court's rejection of Denwalt's claim apparently rests on her conveyance of the equipment in suit to Construction under a covenant that it is free from all encumbrances. Although her act was in a corporate capacity, the court, no doubt, deemed it effective as a bar to any claim she had, whether individually or as executrix of the Ben Haskins' Estate.

Denwalt contends her conveyance of the equipment as an officer of Haskins did not preclude her later assertion of a prior claim to the equipment under her security agreements with Haskins. This is so, she argues here, because the sale of the equipment to Construction, was not made with her prior written consent, which was required under the agreements with Haskins. It is her contention that the bill of sale she gave Construction was a contract between Haskins and Construction and was not effective as a transaction between Haskins and herself.

The legal effect a sale of collateral may have upon existing security interests is governed by 12A O.S.1971 § 9–306(2).[5] That section recognizes two exceptions to the general rule that a security interest survives sale, exchange or other disposition of collateral. The first exception, found in the language "[E]xcept where this Article otherwise provides . . ." is admittedly not apposite here. Consideration must be afforded the second exception expressed in the phrase that where the "disposition was authorized by the secured party in the security agreement or otherwise", the security interest stands released by force of law. By this section a purchaser or transferee of collateral takes free of a security interest *whenever the debtor is authorized by the secured party to dispose of the collateral.* Such authorization may be contained in the security agreement or it may be given in some other way.

There is no contention here that Denwalt's security agreements authorized Haskins to sell the collateral nor is there any evidence of some other written authorization by Denwalt to Haskins. Absent any written consent or waiver of contract provisions against sale, there must then be authorization "otherwise" given, within the meaning of the applicable statute.

■ Under certain conditions, words or conduct of a party may operate to estop him from exacting literal compliance with contract terms. If a party represents or leads one to believe that he will not insist upon literal performance of a contract term, and the other party detrimentally relies thereon, the first party will be held estopped from demanding literal compliance. This much is elementary in law governing estoppel *in pais.*[6]

■ We must hence inquire here whether Denwalt represented to Haskins, by words or conduct, that she would not require it to obtain her prior written consent to sell the collateral, and if so, whether Haskins detrimentally relied upon such representation. We hold that Denwalt's act of executing the bill of sale did in fact constitute a representation to Haskins that it could sell the equipment without complying with its contrary contractual obligation to her. While the bill of sale itself may not have been enough to create such a representation, it was doubtless inferable from Denwalt's conduct in willingly carrying out her corporate function. From the very nature of the transaction it is clear that Haskins had to rely upon this implied representation

---

5. The pertinent part of § 9–306(2) provides: "Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof, unless the disposition was authorized by the secured party in the security agreement or otherwise . . . ."

6. *Downing v. Young Men's Christian Ass'n of U. of Okl.,* 178 Okl. 292, 61 P.2d 859, 861 [1936]; *Apex Siding & Roof. Co. v. First Federal Sav. & Loan Ass'n of Shawnee,* Okl., 301 P.2d 352, 355 [1956].

because if its covenant against encumbrances were to be breached, Haskins would incur liability to the buyer for breach of warranty of title. In short, without Denwalt's representation, a transfer of collateral with the warranty given would make no sense. It would mean no more to Haskins than inevitable breach and potential liability.

Although Denwalt is estopped from insisting on the requirement of a prior written consent before sale of the collateral, nonetheless the exception in § 9–306(2) cannot be satisfied unless we find authorization here from some express or implied consent by the secured party.

■ Before adoption of the Uniform Commercial Code, a secured party could impliedly consent to the sale of collateral.[7] There is no post-Code case law reaffirming the continued viability of this rule.[8] Nothing in the Code itself suggests that recognition of the implied authorization doctrine was intended to be withheld and § 9–306(2) places no limit upon the manner in which authorization may be "otherwise" given. In accord with § 1–103 of the Code, we hence hold that the doctrine of implied authorization has been allowed to remain in force under the Uniform Commercial Code.[9]

■ What act is sufficient to constitute an implied authorization to sell collateral under § 9–306(2) is an issue of fact.[10] Where, as here, the trial court's determination is not clearly against the weight of evidence, it will be sustained on appeal.[11]

■ A secured party will have impliedly authorized a sale of his collateral when, from the circumstances, general language and conduct of the parties, it is found that he intended to authorize the sale. Although Denwalt maintained that she did not intend by any word or deed, to authorize the sale of her collateral, her testimony must be weighed against her conduct.

When Denwalt signed the bill of sale conveying the collateral from Haskins to Construction, although she acted in her corporate capacity, she nonetheless had personal knowledge that it was her collateral that was being transferred by the debtor. She would now have us completely insulate her personal knowledge from her corporate act. This cannot be done. The issue is not whether she should be held individually liable for a corporate contract, but rather whether she intended to authorize disposition of her collateral under a warranty that it was free of encumbrances. Her conduct as a corporate officer must be deemed a relevant indication of her intent as an individual.

Presented with the knowledge that her collateral was being sold by Haskins, Denwalt willingly performed her corporate function which was essential to effect the sale. She could have objected to the sale, refused to execute the bill of sale or made it clearly subject to her security interest. Instead she signed the bill of sale with a warranty against all encumbrances. Al-

7. *Nat'l Bond & Inv. Co. v. Central Nat'l Bank of Enid*, 142 Okl. 96, 285 P. 828, 831 [1930]; *Universal Credit Co. v. Reily*, 171 Okl. 286, 42 P.2d 516, 517 [1935].

8. *Jackson v. Pierce*, Okl., 445 P.2d 281 [1968], decided after the adoption of the UCC, considered the question of whether a mortgagee had given consent to the mortgagor to sell mortgaged personal property. The defendant in that case, a purchaser from the mortgagor who was being sued for conversion, contended that the mortgagee had given oral and written, express and implied, consent to the sale. In finding that consent had been given, the opinion quotes at length from a pre-code case, *Universal Credit Co. v. Reily*, supra note 7, wherein the doctrine of implied consent had been recognized. *Jackson*, curiously silent as to the application of the code provisions [in particular § 9–306(2)], did not state whether it is rested on implied or express consent, although the facts would suggest that it was express.

9. *Central California Equipment Co. v. Dolk Tractor Co.*, 78 Cal.App.3d 855, 144 Cal.Rptr. 367, 23 UCC Rptr.Serv. 1051 [1978]; *In re Cadwell, Martin Meat Co.*, 10 UCC Rptr.Serv. 710 [USDC ED Cal.1970].

10. *Central California Equipment Co. v. Dolk Tractor Co.*, supra note 9.

11. *Wallace v. Smith*, 205 Okl. 557, 240 P.2d 799, 803 [1951]; *Irwin v. Irwin*, Okl., 416 P.2d 853, 858 [1966].

though the act was done in her corporate capacity, she, as an individual, had personal knowledge of whether the facts were actually as the bill of sale purported them to be. Her conduct must imply that she individually intended for Haskins to dispose of *her collateral free of her security interest.*

Neither is Denwalt's post-sale conduct without relevance here. Knowing *her* collateral to have been sold, she took *no* action to assert her claim in the property *until* after this lawsuit was filed—a period of some fifteen months. Since § 9–306(2) does not require a secured party to take any action to preserve his security interest, inaction alone may not lead to a finding of an implied authorization. But inaction under the circumstances here does surely lend added support to the inference that Denwalt's conduct at the time of the sale may operate as an implied authorization.

■■■ If the trial court had rested its judgment on an equitable estoppel theory, the result here must be the same. Just as Denwalt stood estopped to insist on a written consent to sell the collateral, so is she now precluded from asserting that she did not authorize the sale of the collateral. In this instance, however, the estoppel runs between Denwalt and Bank, rather than between Denwalt and Haskins. While it is generally true that estoppel is not available as a basis of an action or defense unless it is plead,[12] it is equally true that if facts are plead which would support the application of estoppel, the court may apply it.[13]

Had Denwalt's security interest not come to a legal end by operation of § 9–306(2), or under an estoppel theory, it would be deemed to have been terminated by the express provisions of the Hewitt/Denwalt

agreement. Its terms do not make Hewitt assume the Haskins' debt. Rather, they clearly extinguish that obligation.

■■■ The Hewitt/Denwalt contract could not be viewed as a novation because the identity of the debt was not preserved nor was Haskins [original obligor] a party to it. In *Martin v. Leeper Bros. Lumber Co.*,[14] we held that to meet the test of a novation there must be a mutual agreement among three parties—the creditor, his immediate debtor and the intended new debtor—by which liability is accepted in the place of the original debtor in discharge of the original debt. Neither did the Hewitt/Denwalt contract constitute an assumption by Hewitt of Haskins' debt. When Denwalt agreed to extinguish the old corporate debt, an entirely new obligation was created with a *new* obligor [Hewitt] and a *new* security interest *in totally different collateral.*[15]

Denwalt's contention here that Hewitt's new obligation to her was but a substitute for the Haskins' debt is not supported by the evidence and her authorities are hence inapposite. They hold that so long as the debt remains unpaid, a substitution of the evidence of debt will not impair the lien of the mortgage.[16] The Hewitt/Denwalt contract was not intended to, nor did it preserve, the Haskins' debt as a separate surviving obligation. The only conclusion to be drawn is that the old debt to Denwalt stood extinguished and that Haskins was intended as a third party beneficiary of the Hewitt/Denwalt contract.

■■■ A security interest is defined as "an interest in personal property or fixtures which secures payment of performance of an obligation."[17] If the underlying obliga-

---

12. *Wheeler v. Brockmeier Co.*, Okl., 418 P.2d 693, 695, 696 [1966].

13. "A party entitled to an estoppel or waiver need not in all cases formally plead them. If the facts constituting the estoppel or waiver are in any way sufficiently pleaded, he is entitled to the benefit of the law arising therefrom." *Palmer v. Crews Lumber Co., Inc.*, Okl., 510 P.2d 269, 271 [1973].

14. 48 Okl. 219, 149 P. 1140, 1141 [1915].

15. Compare *D.W.L., Inc. v. Goodner-Van Engineering Company*, Okl., 373 P.2d 38 [1962].

16. *Methvin v. American Savings & Loan Ass'n of Anadarko*, 194 Okl. 288, 151 P.2d 370 [1944] and *State v. Loose*, 204 Okl. 88, 227 P.2d 402 [1951].

17. 12A O.S.1971 § 1–201(37).

tion ceases to exist, so does the interest securing it.

■ Construction [*qua* owner of the equipment in suit] took no appeal from that part of the judgment which grants the Ft. Smith Bank a security interest in some of its equipment here in litigation. Because Denwalt is without standing to assert error in that adjudication [since she has been adjudged to have no lien and hence no litigable interest in the equipment], the trial court's determination in favor of the Ft. Smith Bank must be regarded as unchallenged. It may not be disturbed on this appeal brought by Denwalt only.[18]

Trial court's judgment, found free from error, is affirmed.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS, HODGES, SIMMS and HARGRAVE, JJ., concur.

18. *Braden Co. v. Robinson*, 171 Okl. 278, 43 P.2d 437, 438 [1935]; *Hudson v. Lee*, Okl., 393 P.2d 515, 520–521 [1964].